IRVING, P.J., DISSENTING:
 

 ¶ 24. The majority reverses and remands the judgment of the Circuit Court of Pontotoc County, dismissing the Westfalls' complaint against Goggins and Carnes because Shannon failed to disclose, during discovery, that prior to the accident between her and Goggins she had suffered complaints and had problems with parts of her body similar to the complaints, problems, or parts of her body that were the subject of her lawsuit against Goggins and Carnes. I dissent because I believe that Shannon's actions fall within the parameters of conduct, as articulated by the Mississippi Supreme Court, that permit a trial judge to dismiss a plaintiff's complaint when the plaintiff has deliberately attempted to subvert the judicial process by willfully refusing to be forthcoming with information that is required to be disclosed during the discovery process. For the reasons discussed below, I would affirm the judgment of the circuit court.
 

 ¶ 25. Shannon and Goggins were involved in a motor-vehicle accident on June 3, 2013. Shannon was driving a 2003 Toyota Avalon, and Goggins was driving a 1994 Freightliner tractor trailer that was owned by his employer, Carnes. Shannon alleged that Goggins was at fault and that she was injured and suffered damages as a result of Goggins's negligence. Therefore, she sued Goggins and Carnes, alleging that Carnes was also liable under the theory of respondeat superior.
 

 ¶ 26. Goggins and Carnes submitted interrogatories to Shannon and took her deposition to ascertain the extent and nature of her injuries attributable to the accident. Among the interrogatories submitted by Goggins and Carnes and responses given by Shannon were these:
 

 INTERROGATORY NO. 7: Have you been involved in any type of accident or had any medical problem, either before or after the accident in question in this case, as a result of which you were seen or treated by a physician or other health care provider in regard to any complaints or problems or parts of your body similar to the complaints, problems, and parts of your body involved in this lawsuit?
 

 RESPONSE: In 2010, I slept wrong and had a muscle spasm in my left shoulder. I was seen by Dr. Scott at Creekmore Clinic, and I have not had any other problems until the accident.
 

 INTERROGATORY NO. 8: If your answer to Interrogatory No. 8 [sic] is affirmative, for each and every such accident or medical problem, number and list the accident, medical problem, or injury, and state the date and details of the accident, the nature and type of the problem or injury, the names and addresses of
 any physicians, nurses, therapists, chiropractors, or other health personnel seen for treatment, the dates and duration of any period of hospitalization, the reasons or symptoms for which treatment was sought, the date and time treatment was sought, the manifestations of pain or injury which made [sic] to the physicians, nurses, therapists, chiropractors, or other health personnel, the exact type and duration of treatments given, and the effects of the treatments on the injury.
 

 RESPONSE: Dr. Scott took x-rays, but nothing showed up. He gave me pain medication and a muscle relaxer. The spasms went away and I have had no other problems until the accident.
 

 ****
 

 INTERROGATORY NO. 16: In your complaint you allege that you "sustained serious physical injuries" and "have undergone serious and continuous medical treatment for the injuries" as a result of the accident. State each and every fact on which you base this allegation and, for each and every such fact, state the name, residence address, residence telephone number, business address, and business telephone number of any and all persons who have knowledge of the fact.
 

 RESPONSE: I suffered a torn right rotator cuff injury which has required surgery. [There] is also a possible tear to my left rotator cuff.
 

 ¶ 27. Excerpts from Shannon's deposition reflect the following colloquy between Shannon and Goggins and Carnes's attorney:
 

 Q. Tell me what kind of injuries you sustained in the accident?
 

 A. I tore my right rotator cuff, and I had to have surgery to repair it twice. And I've had from July 22nd to almost Christmas, three days a week of physical therapy.
 

 Q. I asked you in Interrogatory No. 7 had you had any other accident or any kind of medical problems associated with the body that was-parts of your body that were hurt in the accident. And you said, "In 2010, I slept wrong and had a muscle spasm in my left shoulder."
 

 A. Yes, ma'am.
 

 Q. Did he-did he-I think you told-in another answer, you told me he gave you, like, a muscle relaxer?
 

 A. Yes, ma'am.
 

 Q. And what else did he give you?
 

 A. That was probably it, and maybe a pain-you know, a couple of pain pills, but that was it.
 

 Q. And so that's the only injury you had sustained to either one of your shoulders before the accident.
 

 A. Yes, ma'am.
 

 Q. And you have never seen a physician about the shoulders before.
 

 A. No, ma'am.
 

 * * * *
 

 Q. And you hadn't fallen and hurt your shoulder or-
 

 A. No.
 

 Q. -thrown a bale of hay and, you know, popped your shoulder or anything like that?
 

 A. No, ma'am. I'm not-I'm not into manual labor, so no, ma'am.
 

 Q. And you've not gotten any other prescriptions other than that in 2010 for your shoulder.
 

 A. I've been on anxiety medicine and sleeping medicine.
 

 Q. No. I mean for pain in your shoulders.
 

 A. No, ma'am. No, ma'am.
 

 * * * *
 

 Q. Here's your-you said when your left shoulder-you slept wrong, and he did prescribe you muscle relaxers, but that's the only medication you've received for shoulder pain?
 

 A. That I can recall of.
 

 * * * *
 

 Q. Prior to the accident, had you had any [x]-rays or MRIs or any kind of diagnostic procedures on either one of your shoulders?
 

 A. I don't recall prior to the accident.
 

 ¶ 28. Shannon's medical records tell a different story about her medical history-with respect to her shoulders-prior to the accident. As shown by her responses to the interrogatories and her deposition testimony, Shannon identified only one incident regarding a problem with her left shoulder, and
 
 did not identify any pre-existing conditions or problems
 
 regarding her right shoulder, the one alleged to have been injured in the accident. Yet her medical records reflect the following:
 

 Undisclosed Pre-accident Left Shoulder Medical History
 

 ¶ 29. On February 1, 2010, Shannon sought treatment at Creekmore Clinic for an injury to her right shoulder and an injury to her left shoulder that occurred several days earlier when she was wrestling. Her physician diagnosed her with a shoulder contusion, ordered two x-ray views of the shoulder, and prescribed Darvocet-N and Flexeril.
 

 ¶ 30. On September 9, 2010, Shannon sought treatment at the emergency room of North Mississippi Medical Center. The emergency-room physician diagnosed her with back pain and left joint and shoulder pain and prescribed a Medrol Dose Pack and Flexeril.
 

 ¶ 31. On October 3, 2012, Shannon sought treatment at North Mississippi Medical Center, complaining of back, neck, and left-shoulder pain. She indicated that she had been suffering with the pain ever since she experienced a fall approximately a month earlier. She was prescribed Lortab and the muscle relaxer Robaxin.
 
 [2]
 

 ¶ 32. On February 25, 2013, just a little over three months prior to the accident, Shannon sought treatment at the Acute Care & Family Clinic of Pontotoc, complaining of, among other things, left-shoulder pain, and pain in her right shoulder from an injury that she had sustained two to three years earlier. She was prescribed Meloxicam for pain.
 

 Undisclosed Pre-accident Right Shoulder Medical History
 

 ¶ 33. On March 4, 2011, following a fall from the steps of her deck, Shannon sought treatment at North Mississippi Medical Center for pain in her right shoulder and other areas of her body. Then, on August 18, 2011, Shannon sought treatment at Pontotoc Hospital for throbbing pain in the right side of her neck and right shoulder after she felt a pop while putting clothes in a dryer. She was prescribed Lortab.
 

 ¶ 34. Shannon's "records from [a] visit to the Creekmore Clinic on [March 21, 2012,] indicate that she had a prior surgery to repair a right rotator cuff and that she had a history of rotator cuff syndrome of the shoulder."
 
 [3]
 
 On October 3, 2012, Shannon presented to North Mississippi Medical Center, complaining of right-shoulder pain
 and of experiencing tenderness in the AC joint of her right shoulder. Her right shoulder was x-rayed, and she was prescribed Lortab and the muscle relaxer Robaxin. Note, in my earlier discussion of the undisclosed, left-shoulder problems and complaints, Shannon indicated that she had been having the pain in her neck and left shoulder ever since suffering a fall a few months earlier. It is not clear whether she also had been having the right-shoulder pain and the tenderness of the AC joint of her right shoulder ever since the earlier fall.
 

 ¶ 35. As noted earlier, on February 25, 2013, Shannon sought treatment at the Acute Care & Family Clinic of Pontotoc, complaining of pain in her right shoulder from an injury that she had sustained two to three years earlier. She was prescribed Meloxicam for pain.
 

 ¶ 36. Additionally, the record reflects that on June 24, 2013, which was after the accident in question, Shannon visited Dr. Thomas A. Shands. His medical records indicate that Shannon presented complaining of right-shoulder pain from a motor-vehicle accident, and she indicated that she had "
 

 no prior history of problems with shoulders
 

 ." (Emphasis added).
 

 ¶ 37. Returning to Shannon's undisclosed, pre-accident medical history, I mentioned earlier that, in determining that dismissal was appropriate, the circuit court did not consider Shannon's medical record of March 21, 2012, that indicated she had surgery to repair a rotator cuff, and a history of rotator cuff syndrome of the shoulder. That was because Shannon's attorney said that was an erroneous entry, and he offered to provide information to prove his contention. The record reflects the following colloquy between the circuit court and Shannon's attorney on this point:
 

 THE COURT: And you're saying her prior surgery by the Creekmore Clinic, that didn't happen, even though the medical records show that she had a prior rotator cuff surgery back on March the 12th, 2012?
 

 [COUNSEL]: That is exactly what I'm saying, Your Honor.
 

 THE COURT:
 

 Have you got up with them since then to enter some kind of affidavit that they're wrong
 

 ? And certainly they could easily go back and see if she had surgeries or not.
 

 [COUNSEL]: That's correct, Your Honor. No, sir, I don't have that. But if-I'll be-I know it would be outside the date of this motion hearing, but if you would give me one week I can have that for Your Honor to supplement this hearing. If you'd allow me the time to do that, I could certainly do it.
 

 THE COURT: I'll consider it.
 

 (Emphasis added).
 

 ¶ 38. Later, Shannon's counsel produced the following letter from Dr. Creekmore, along with what was termed an audit-trail document:
 
 [4]
 

 To Whom It May Concern:
 

 This is a note to explain an apparent discrepancy in the records on Ms. Shannon Westfall, a patient at Creekmore Clinic. Her medical records show, under past medical history, that she had [a] repair of [a] rotator cuff[,] and rotator
 cuff syndrome of the shoulder. These were present in her progress notes of March 2012 by Dr. Scott but were not in the progress note of Candace McGreger in October of 2012.
 

 I am enclosing an audit that indicates when an item is inserted into a medical record, as well as who inserted it. It shows Dr. Brad Scott inserted the rotator cuff repair and rotator cuff shoulder syndrome October 7, 2013. Dr. Scott signed his medical record and these two progress notes on January 2, 2014.
 

 This will explain the discrepancy between the two progress notes. This can occur when we review or make corrections in our medical records. Fortunately, there is an audit trail which explains the chronology of these corrections.
 

 If you have any further questions, please call.
 

 Sincerely,
 

 Samuel J. Creekmore, M.D.
 

 ¶ 39. Dr. Creekmore's letter and the audit-trail document speak for themselves, and I will not comment on whether they adequately explain the discrepancy. I simply note that Dr. Creekmore's letter and the audit-trail document are not the affidavit that Shannon's counsel seemingly promised the circuit court during the colloquy quoted earlier in this dissent. Having said this, I should note that the medical records of Dr. Johnny H. Mitias, the surgeon who performed the rotator cuff repair after the accident, are silent as to whether Shannon had a previous surgery for repair of a rotator cuff.
 

 ¶ 40. Before specifically addressing the majority's position, I make the following observations from the facts discussed earlier: first, it cannot be legitimately contended that the questions asked of Shannon were ambiguous and that Shannon did not understand them or that her responses are "open to potential truthful interpretations." Second, Shannon's response to Interrogatory No. 7-that she had not had any problems with her shoulders since "sleeping wrong" and suffering muscle spasms in her left shoulder in 2010-is not only false, but also shows, without question, that she understood that she was being asked about pre-accident problems generally with her shoulders, not just about injuries related to the accident. Third, her interrogatory response and deposition answer that she had not received any prescriptions for pain for her shoulders since receiving a prescription in 2010 when "she slept wrong," is a patent untruth. Fourth, Shannon failed to disclose that she had been treated for shoulder pain during the three years immediately prior to the accident by various medical providers, including Dr. Creekmore, Acute Care & Family Clinic of Pontotoc, and North Mississippi Medical Center.
 

 ¶ 41. I now turn to a discussion of the majority's position. I note that the majority seems to recognize that we are to review the circuit court's decision under an abuse-of-discretion standard and that we must affirm the decision of the circuit court unless we possess a definite and firm conviction that the circuit court committed a clear error of judgment in the conclusion it reached upon its weighing of the relevant factors.
 
 See
 

 Ashmore v. Miss. Auth. on Educ. Television
 
 ,
 
 148 So.3d 977
 
 , 981-82 (¶¶ 10-11) (Miss. 2014). However, I am not sure that the majority fully recognizes that as we review the trial court's decision, we must also consider "whether the decision was one of several reasonable ones [that] could have been made."
 

 Id.
 

 at 985
 
 (¶ 26). I readily admit that our caselaw makes clear that the dismissal of a plaintiff's complaint for failure to comply with discovery should be dismissed "only under the most extreme circumstances," when a plaintiff has "knowingly refused to be forthcoming and
 actively withheld the truth from the court," or given "clear and unequivocal falsehoods."
 
 Kinzie
 
 ,
 
 164 So.3d at 977-78
 
 (¶¶ 5-8). I believe Shannon is guilty of each of these transgressions.
 

 ¶ 42. First, the majority seems to suggest that because Goggins and Carnes were able to obtain all of the undisclosed information via the medical authorization that Shannon provided, she was somehow forthcoming, therefore, making her conduct less extreme. In taking this position, the majority recognizes that a plaintiff's submission of a medical release does not relieve the plaintiff of the obligation to give full and truthful discovery. Yet, the majority says, without citing any authority, that "Shannon's provision of medical authorization to [Goggins and Carnes] in discovery does weigh against a finding that Shannon made an intentional misrepresentation or blatantly lied about her medical history." Maj. Op. at n.1. Nothing supports this proposition in the cases cited in the majority opinion, where the Mississippi Supreme Court affirmed dismissals by the trial court.
 

 ¶ 43. Second, the majority says:
 

 The record indicates that there was some confusion between the injuries to her left and right shoulders. But, this confusion does not lead to the conclusion that Shannon made intentional and deceitful misrepresentations. We simply do not find evidence to support the conclusion that Shannon intentionally misled or blatantly lied in her discovery responses.
 

 Maj. Op. at (¶ 20). I do not know what to make of this statement by the majority. If the majority had not published the relevant interrogatories, Shannon's responses to them, relevant excerpts from her deposition testimony, and her undisclosed records, I would be tempted to say, even though it may sound paradoxical, that we read different records. Since we did not, I am left to ponder, without explanation, how the majority arrived at its conclusion, for Shannon "presented no credible explanation for the total lack of congruence between her testimony [and her responses to the interrogatories] and her medical records."
 
 Kinzie
 
 ,
 
 164 So.3d at 978
 
 (¶ 7) (internal quotation marks omitted). Moreover, there was no confusion between the injuries to Shannon's left and right shoulders. Certainly, nothing in the record supports this statement by the majority. Shannon was clear that she had suffered only one injury to one shoulder and that was to her left shoulder. Further, even if there had been some confusion, which there was not, Shannon was required by the interrogatories to disclose problems and/or injuries with and to both shoulders.
 

 ¶ 44. Third, in an attempt to show a lack of comparison between the facts in today's case and those in
 
 Pierce
 
 ,
 
 Scoggins
 
 , and
 
 Ashmore
 
 , the majority, quoting
 
 Kinzie
 
 , states:
 

 When we compare the facts here to the earlier cases, we conclude that Shannon "did not blatantly lie about the existence of a witness, as did the plaintiff in
 
 Pierce
 
 , nor did she completely misrepresent years of medical history and procedures, as did the plaintiff in
 
 Scoggins
 
 , nor did she hide any other surgeries, as did the plaintiff in
 
 Ashmore
 
 ."
 

 Maj. Op. at (¶ 19) (quoting
 
 Kinzie
 
 ,
 
 164 So.3d at 978
 
 (¶ 11) ). I am flummoxed by the majority's reasoning. Our caselaw does not hold that a plaintiff's case can be dismissed only if the plaintiff has lied about the existence of a witness, completely misrepresented years of medical history and procedures, or hidden other surgeries. Each case turns on its own facts. What is always under scrutiny is the plaintiff's actions in the particular case, whether it is lying about the existence of a witness, the
 nondisclosure of prior surgeries, or blatantly lying about some other relevant fact or facts. As noted earlier in this dissent, the plaintiff here lied about many things and was not forthcoming about the physicians and medical providers that she had seen for problems related to her shoulders, the exact part of her body that she claimed had been injured in the accident that was the subject of her complaint. And Shannon capped her lies when she saw Dr. Shands after the accident and relayed that she had no history of shoulder problems. It is obvious that this false representation to Dr. Shands was for the sole purpose of obtaining a medical opinion that the rotator cuff tear occurred in the accident, although it may have occurred during some of the numerous other shoulder injuries that Shannon had suffered.
 

 ¶ 45. Here, the violations are similar to those that supported dismissal of the action in
 
 Scoggins
 
 ,
 
 743 So.2d at 995
 
 (¶ 18). In spite of the fact that Carnes was in possession of Shannon's medical records,
 
 [5]
 
 Shannon failed to identify her previous medical history when prompted. In her interrogatory responses, Shannon identified only one incident regarding a problem with her left shoulder, and did not identify any pre-existing conditions or problems regarding her right shoulder, the shoulder alleged to have been injured in the accident. Further, in her deposition, she testified about the problem with her left shoulder only, despite the fact that there were eight other instances in which her medical records showed that she had sought medical treatment for pain in both her left and right shoulders-four regarding the left shoulder and four regarding the right shoulder. This number excludes the March 21, 2012 medical record entry regarding her right shoulder that the trial judge did not consider.
 

 ¶ 46. In
 
 Pierce
 
 ,
 
 688 So.2d at 1389
 
 , the Mississippi Supreme Court outlined the following four considerations to guide trial courts in the exercise of their discretion to dismiss vel non a case for a discovery violation:
 

 [ (1) ] First, dismissal is authorized only when the failure to comply with the court's order results from wil[l]fulness or bad faith, and not from the inability to comply. [ (2) ] Dismissal is proper only in situation[s] where the deterrent value of Rule 37 cannot be substantially achieved by the use of less drastic sanctions. [ (3) ] Another consideration is whether the other party's preparation for trial was substantially prejudiced. [ (4) ] Finally, dismissal may be inappropriate when neglect is plainly attributable to an attorney rather than a blameless client, or when a party's simple negligence is grounded in confusion or sincere misunderstanding of the court's orders.
 

 (Citation omitted).
 

 ¶ 47. With the breadth of Shannon's misrepresentations, in what I believe was bad faith as she "knowingly refused to be forthcoming and actively withheld the truth from the court," it is my opinion that the trial court was correct in dismissing the case as the appropriate sanction under Rule 37.
 
 Kinzie
 
 ,
 
 164 So.3d at 977
 
 (¶ 6). As to the effect of any prejudice to Carnes, I agree with the trial court's statement that "[i]t would be ridiculous to allow a party who completely thwarts discovery to escape penalty simply because it could not be proven that other litigants were in fact
 deceived by such misconduct or actually relied upon [it]." (Quoting
 
 Pierce
 
 ,
 
 688 So.2d at
 
 1390 ). The failure to disclose eight out of nine instances in which she had been treated by a physician for problems with her shoulders was a blatant disregard for her discovery obligations, worthy of the dismissal of her complaint. Therefore, I dissent. I would affirm the judgment of the circuit court dismissing the Westfalls' complaint.
 

 BARNES AND CARLTON, JJ., JOIN THIS OPINION; GREENLEE AND WESTBROOKS, JJ., JOIN THIS OPINION IN PART.
 

 APPENDIX
 

 ?
 

 On this occasion, Shannon also complained of right-shoulder pain. Later in this opinion, I discuss the undisclosed right-shoulder problems and complaints.
 

 The circuit court did not consider this medical record in deciding that dismissal of Shannon's complaint was appropriate. Later in this dissent, I discuss the reasons for the court's decision not to consider this record.
 

 The audit-trail document has been retyped for clarity and is attached to this dissent as an appendix.
 

 See
 

 Conklin v. Boyd Gaming Corp.
 
 ,
 
 75 So.3d 589
 
 , 595 (¶ 16) (Miss. Ct. App. 2011) (holding that simply submitting medical releases does not remedy repeatedly providing false answers during discovery).